Larry L. EPPS et al., Plaintiffs,

v.

Mark A. LEVINE, Defendant.

Civ. A. Nos. M–73–525, M–73–341.

United States District Court,
D. Maryland.

Feb. 6, 1980.

Lawrence B. Coshnear and Richard North, Baltimore, Md., for plaintiffs.

Stephen B. Caplis, Asst. Atty. Gen., Baltimore, Md., for defendant.

CONSENT DECREE

JAMES R. MILLER, Jr., District Judge.

The parties before the court for the purpose of entering into this Consent Decree are Larry L. Epps and James Benvenuti, Plaintiffs, on their own behalf and on behalf of the members of the class which they represent, and Mark A. Levine and the class of Maryland jail wardens, Defendants, their successors, agents, servants and employees, all parties being represented by counsel.

All of the aforementioned parties desire to resolve the claims raised in Civil Action Nos.: M–73–525 and M–73–341 without expending the substantial time, effort and cost of contested litigation.

It appearing to the Court that the parties have agreed to the entry of this Decree, it is this 12th day of Feb., 1980, hereby

ORDERED, ADJUDGED AND DECREED that:

1. *Terms*

The terms of this Decree are applicable to the confinement status and classification of all pre-trial detainees who are awaiting trial in the Maryland courts and who have been transferred from a county or city jail to the Maryland Penitentiary pursuant to Article 27, Section 690(f) of the Annotated Code of Maryland. (Referred to herein as detainees).

2. *Purpose*

The purpose of this Consent Decree is to assure that pre-trial detainees are detained with the least restrictions necessary to accomplish the State's interest in insuring that they appear at trial and in maintaining security and order within its institution.

3. *Admission Procedure*

Upon transfer pursuant to a State Court Order under Article 27, Section 690(f) of the Annotated Code of Maryland, to the Peni-

tentiary, the detainee will be placed in Administrative Segregation and interviewed by a Classification Team within 24 hours of his arrival. Except, that if a detainee is received at the Penitentiary after 5:00 p. m. on Friday, he will be interviewed by said Classification Team on Monday morning.

4. The purpose of the said classification interview is to ascertain whether the detainee's presumptive housing on the Protective Custody Unit, where the goals set out in paragraph 2 above may best be accomplished, is safe for both the detainee and others.

5. The Classification Team's decision shall be made promptly after the interview and the decision shall be implemented forthwith. If the Classification Team makes a specific factual finding that placing the detainee in the Protective Custody Unit creates a security risk with respect to himself or others, then the Classification Team may initiate proceedings for placing the detainee in Administrative Segregation. The procedures to be followed in this event are embodied in Division of Corrections Regulation 110–19, September 1, 1979, appended hereto as Exhibit A.

6. If after an initial classification and placement on the Protective Custody Unit, the prison officials have reason to believe that administrative segregation is necessary, then they may proceed in accordance with Division of Corrections Regulation 110–119, September 1, 1979.

7. If at any time the detainee is charged with an infraction of the institutional rules, then any action taken by the Adjustment Team will be in accordance with the Adjustment Team's regulations. *See*, Division of Corrections Regulation 105–2; appended hereto as Exhibit B. *Bundy v. Cannon*, 453 F.Supp. 856 (1978) (Revised Appendix July 19, 1978).

8. Detainees housed in the Protective Custody Unit will be accorded the same rights and privileges accorded inmates in Protective Custody pursuant to the following terms agreed to by the State in *Midgett, et al. v. McClellan, et al.*, Civ. Action No. 71–1076–8M:

a. *Use and renovation of the "old dining room" area.*

Each protective custody prisoner shall be afforded the opportunity for daily exercise and recreation on weekdays in the old dining room area under the provisions of MPD No. 145–1 (January 31, 1978). This directive will be modified in paragraphs 4(a) and (b), however, to specifically provide that such exercise and recreation may only be restricted because of insufficient staffing when such a condition is caused by an emergency. It is understood between the parties that insufficient staffing is justification for restricting exercise and recreation only in emergency or unusual situations. Although the parties agree that the first floor of the old dining room building is presently suitable for use by P.C. prisoners, the Division of Correction agrees to continue to move forward with the implementation of a plan to renovate the basement and to use it as the principal P.C. recreation area.

b. *Housing.*

Protective custody inmates will be housed in single person cells which have all of the fixtures, equipment and furnishings that are provided for the general population including, but not necessarily limited to, a toilet and sink in working order, a bed, a clean and usable, non-flammable mattress and pillow, adequate lighting, heating and ventilation, regularly cleaned sheets, pillowcase and blanket, personal clothing and personal property, legal materials, reading materials, and hygienic materials for the inmate and his cell.

c. *Equal treatment in general.*

Inmates in protective custody will receive the same treatment in every respect and will have access to all of the same programs, facilities and services which are provided for inmates in the general population unless to provide such access and treatment is clearly inconsistent with assuring the personal safety of a protective custody inmate.

d. *Hygiene.*

Protective custody inmates will be permitted to have daily shaves, regular haircuts, regular laundry service (MPD No. 220–4(1)) and showers at least twice per week.

e. *Outdoor exercise.*

Each P.C. prisoner shall be afforded the opportunity for exercise every other day in a protected area of the yard unless weather, an emergency or some other unusual situation prevents use of the yard.

f. *Escort by correctional officers.*

Protective custody inmates will be escorted by correctional officers when they leave the P.C. tier. Protective custody inmates will not be required to wear handcuffs while being escorted.

g. *Visiting.*

P.C. inmates will have the same visiting privileges as other inmates in general population; that is, P.C. inmates will receive the same number of visits and will have their visits in the regular visiting room.

h. *Library.*

The institution library will provide for P.C. inmates books and legal reference materials if they are available in the institution.

i. *Commissary.*

P.C. inmates will receive regular commissary privileges the same as any other inmate in general population.

j. *Medical care.*

P.C. inmates will have the same access as inmates in the general population to sick call, admission to the hospital, regular medical and dental services and psychiatric and psychological services. Twice weekly medical rounds will be made to each inmate in P.C. by either a physician or a physician's assistant who is a trained paramedic and neither a correctional officer nor an inmate. Daily rounds will be made to each inmate in P.C. by a correctional officer, physician or physician's assistant to take any requests from P.C. inmates for sick call.

k. *Classification officers.*

A special P.C. caseload will be established and maintained with one or more classification officers specially assigned for inmates on the P.C. tier. The assigned classification officer will make at least one visit per week to each inmate on the protective custody tier.

l. *Religion.*

Chaplains will make regular rounds on the P.C. tier, and religious services will be arranged when appropriate.

m. *In-cell activities.*

The institution will make a reasonable effort to provide P.C. inmates with work and/or other useful activities that can be done by the inmates in their cells.

n. *Education.*

The institution will develop a tutoring and education extension program for any inmate in P.C. who desires to participate in such activities.

o. *Meals.*

Food that is served to inmates in P.C. will be served in proper portions according to the menu and at the proper serving temperature.

9. Detainees housed in Administrative Segregation (not the Protective Custody Unit) for other than punitive reasons, will be accorded the following treatment:

a. *Hygiene.*

Detainees will be permitted to have the same amenities as those inmates in Protective Custody.

b. *Outdoor exercise.*

Detainees shall be afforded the same opportunity for exercise as those in Protective Custody.

c. *Visitation.*

Detainees will have the same visiting privileges as other inmates in general population, that is, detainees will receive the same number of visits and will have their visits in the regular visiting room.

d. *Library.*

The institutional library will provide detainees books and legal reference materials if they are available in the institution.

e. *Commissary.*

Detainees will receive regular commissary privileges the same as other inmates and general population.

f. *Medical care.*

Detainees will have the equivalent access as inmates in general population to sick call, admission to the hospital, regular medical and dental services and psychiatric and psychological services. At least once weekly medical rounds will be made to each detainee by either a physician or a physician's assistant who is neither a correctional officer nor an inmate. Daily rounds will be made to each detainee by a correctional officer, physician or physician's assistant to take any request for sick call.

g. *Religion.*

Chaplains will make regular visits to pre-trial detainees.

h. *In-cell activities.*

The institution will make reasonable efforts to provide detainees with work and/or other useful activities that can be done by detainees in their cells.

i. *Education.*

The institution will develop a tutoring and educational extension program for any detainee who desires to participate in such activities.

j. *Meals.*

Food that is served to detainees will be served in proper portions according to the menu and at the proper serving temperature.

10. *Access to Attorneys*

In recognition of the special needs of detainees to keep in contact with their attorneys with regard to preparation of their defense, the following procedures will exist with regard to telephone communication:

The detainee may submit a request to the warden to contact his attorney by telephone. Upon receipt of said request, the warden will forward the request to a classification counselor who will in turn call the attorney to ascertain whether the attorney wishes to speak to the detainee. If the attorney wishes to speak to the detainee, then the classification counselor will make the necessary arrangements to have the detainee transported to a telephone where he can communicate confidentially with his attorney. The detainee will not be asked to divulge confidential information in order to obtain this telephone call but need only give a general statement as to the purpose of the call.

11. *Posting and Distribution of the Regulations*

A copy of the provisions enumerated in this Decree and any regulations referred to herein will be distributed to all staff charged with enforcing these policies and procedures embodied herein and given to each detainee when initially classified pursuant to paragraph 3 of this Decree.